UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

J.L. and J.L., individually and on behalf of C.L.,
a child with a disability,

               Plaintiffs,

      -against-

City School District of the City of New York, d.b.a.
New York City Department of Education,

               Defendant.

———————————————————————— x

12 Civ. 1516 (CM)

**DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS
MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

      Before the Court is an appeal by the parents of C.L., a child with a disability, from an order of a State Review Officer (SRO) of the New York State Education Department that (1) reversed an order of an Impartial Hearing Officer (IHO), (2) concluded that Defendant had offered to provide C.L. with a Free Appropriate Public Education (FAPE) within the meaning of the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1415 *et seq.*, and (3) denied the parents' application to have the taxpayers of the City of New York fund their child's education at a private school of their choice, the Churchill School. Finding no error in the SRO's determination that the Individualized Education Plan (IEP) prepared for C.L. offered the child a FAPE, and perceiving no procedural error that denied the parents their right to participate fully in the process that led to the formulation of that IEP, this court AFFIRMS the SRO's decision and grants the City Department of Education summary judgment dismissing the complaint.

**STANDARDS APPLICABLE ON IDEA REVIEW
OF AN ADMINISTRATIVE DETERMINATION**

      When an action is brought under the IDEA to appeal a final decision of the SRO, the Second Circuit has recognized summary judgment as the procedural mechanism for reviewing

1

such administrative decisions. *A.C. ex rel. M.C. v. Board of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). However, "'the role of the federal courts in reviewing state education decisions under the IDEA is circumscribed.'" *Id., quoting Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). While this Court must engage in an independent review of the record, and make a determination based on a preponderance of the evidence, in so doing, it may not substitute its own notion(s) of sound educational policy for those of the school authorities being reviewed. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *see also A.H. ex rel. J.H. v. Department of Educ. of City of New York*, 2010 WL 3242234, *1 (2d Cir. Aug. 16, 2010). In fact, the Second Circuit has determined that "it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).

Deference must be given to state administrative bodies because, as the Supreme Court has cautioned, the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 113, *quoting Rowley*, 458 U.S. at 206, 208; *see also A.C. ex rel. M.C.*, 553 F.3d at 171. Courts therefore defer to the final decision of the state authorities, which in this instant is the SRO's Decision. *See R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.*, 366 Fed. Appx. 239, 2010 WL 565659, *2 (2d Cir. Feb. 18, 2010), *quoting A.C. ex rel. M.C.*, 553 F.3d at 171; *M.F. v. Irvington Union Free Sch. Dist.*, 719 F. Supp. 2d 302, 307 (S.D.N.Y. 2010).

To determine whether the parents are entitled to tuition reimbursement, the Second Circuit engages in a three step process. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Cerra, 427 F.3d at 192; see also T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009). First, it determines whether the proposed IEP was developed in compliance with the procedures set forth in the IDEA. Second, it determines "whether the proposed IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.'" *Id., quoting Rowley*, 458 U.S. at 206-207. If the first two steps are answered affirmatively, then the obligations imposed by the IDEA have been satisfied and nothing more can be required from the District. *See Cerra,* 427 F.3d at 192. Only if the IEP is procedurally or substantively deficient is the third step reached, which assesses whether the private placement and/or services are appropriate to the child's needs and the extent to which equitable considerations support the reasonableness of the parents' actions. *A.C. ex rel. M.C.*, 553 F.3d at 171, *citing Cerra,* 427 F.3d at 192 and *citing Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006), *cert. denied* 552 U.S. 985 (2007).

The SRO's decision contains an exhaustive recital of the law applicable to the provision of a FAPE to a student. No purpose would be served by reprinting it here; I incorporate it by reference from pages 9-11 of the SRO Decision. The particular points that need to be emphasized on review are the following:

2

1. A FAPE is offered to a student when the Board of Education complies with the procedural requirements of IDEA and the IEP developed by its Committee on Special Education (CSE) is reasonably calculated to enable the student to receive educational benefits.

2. A school district offers a FAPE by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.

3. An "appropriate" education is one that is likely to produce progress, not regression, and to afford the student some meaningful benefit that is more than trivial advancement.

4. An "appropriate" education is not required to maximize the potential of a student with disabilities or to provide everything that might be thought desirable by loving parents.

5. The Board of Education may be required to reimburse parents for their expenditures for private educational services if the services offered by the Board were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim.

6. The burden rests with the Board of Education to prove that it has offered the child a FAPE, while the burden of proving the appropriateness of a parent's unilateral placement of a child in a private school and the equity of tuition reimbursement rests with the parents.

7. In addition to offering the child a FAPE, the Board of Education must offer the parents a meaningful opportunity to participate in formulating their child's educational plan; however, not every procedural misstep will render an IEP legally inadequate.

Citations for all of these principles can be found at pages 9-11 of the SRO Decision.

## BACKGROUND

Bearing the above precepts especially in mind, we turn to the record.

The SRO's decision is (in the experience of the Court) unusually thorough in its description of the contents of the record. The Court, having reviewed the record, finds no fault in the SRO's description of the child's educational history; its characterization of the testing and evaluation that was done prior to preparing the child's IEP and the results of that testing and evaluation; its description of the CSE meeting at which the child's IEP was reviewed with the

parents and of the details of the IEP; the parents' contemporaneous efforts to secure a spot at the private Churchill School for their son; the District's notification to the parents of its final notice of recommendation, including the name of the school to which C.L. was assigned; and the parents' decision to reject the District's recommended program and to place their child unilaterally at Churchill for his kindergarten year (2010-11). These matters are discussed in detail in the SRO's decision at pages 1-7. I adopt them as my findings of fact.

In particular, I emphasize that the record supports the following findings by the SRO.

## I. The Individualized Education Plan

The CSE considered and rejected two possibilities for C.L.: a general education setting (*i.e.*, "mainstreaming") with special education teacher support and additional services, and a specialized class at a special school (like Churchill). The CSE considered the former inadequate because it would not have addressed the student's delays in language processing and social/emotional skills. The CSE rejected the latter option (the parents' preferred option) because, considering the student's overall abilities and cognitive strengths (which are recounted at length in the SRO's opinion), a setting that did not expose the child to his non-disabled peers was too restrictive.

An IEP incorporating the CSE's recommendation – placement in a specialized class at a non-specialized school with services – was prepared and discussed at a meeting held on March 12, 2010. Present at this meeting were the parents, two special education teachers (one of whom served as the district representative), a general education teacher, a school psychologist, a CDC social worker, and the parents' attorney. The parents declined in writing the attendance of an additional parent member. (SRO Decision at n.5.)

On June 15, 2010, the District sent a final notice of recommendation (FNR) to the parents; this notice included the information that their son would be assigned to MO2 PS 198. The parents received this notification on June 16, 2010. The child's father visited the assigned school on June 23, 2010; the visit, as described by the SRO, was not satisfactory to the parent.

A side by side comparison of the District's IEP for C.L. for the 2011-12 school year and the program he attended at Churchill during that school year reveals the following similarities/differences:

| NYC District IEP at ME | Churchill Program |
|---|---|
| Child placed in 12:1+1 special classroom | Child placed in a 12:1+1 classroom |
| Two 30 minute counseling sessions per week in a 1:1 setting | One 30 minute health and human relations class (counseling) in a 6:1 setting |

4

| | |
|---|---|
| Two 30 minute occupational therapy sessions per week in a 1:1 setting | One 30 minute occupational therapy session per week in a 3:1 setting |
| Two 30 minute speech-language therapy sessions per week in a 1:1 setting | Two 30 minute speech-language therapy sessions per week in a 3:1 setting |

The SRO also observed that the child was also receiving 30 minutes of private speech-language therapy once per week, and that he attended a private "socialization group" outside of school once per week for an unspecified period of time.

As can readily be seen, there is virtually no difference in the two school-based programs – except that C.L. was actually offered *more* services, with *more* personalized attention, in the public school than he obtained at Churchill. Nonetheless, the parents rejected the District's recommended program. Since the parents were hard-pressed to object to the classroom setting and services that were being offered by the District, they focused their objections on the assigned school. Their principal objection was that PS 198 was too large to allow their child to participate in mainstream activities (activities that would be entirely missing at Churchill, a private school that serves exclusively learning disabled students). In particular, they were concerned that there would be too many other children around their son at lunch, recess, assemblies, and other school-wide events.

The parents also alleged that they were not provided with any information about the functional levels of the other children who would be in their son's class. And they insisted that the classroom was not appropriately structured to allow the child to learn – even though the class size and staffing level were identical to what was offered at Churchill.

## II. Prior Administrative Proceedings

### A. The Impartial Hearing

The parents filed a due process complaint on January 18, 2010. They alleged, *inter alia*, that the District had denied their son a FAPE for the 2010-11 school year on a variety of substantive and procedural grounds, including: the March 2010 CSE lacked an additional parent member; the District failed to conduct new evaluations of the child prior to developing the March 2010 IEP; the March 2010 IEP did not describe the student's present levels of performance; the March 2010 CSE did not discuss annual goals or short-term objectives, or to the extent that it did so, the goals were vague, generic and lacking a baseline from which to measure student progress; the March 2010 CSE did not explain to the parents how the recommended class would address the student's deficits or identify which related services the student would receive; the FNR was untimely (by a day), thereby entitling the parents to a so-

called "Nickerson letter" authorizing the parents to place the child in a New York State approved nonpublic school at no cost to the parents.

The complaint urged that Churchill, a New York State approved nonpublic school, was an appropriate placement for their son for his kindergarten year, and that equitable considerations favored an award of tuition reimbursement for the parents' unilateral placement of the child there. The parents sought the issuance of a Nickerson letter for the year in question or, in the alternative, reimbursement for the student's Churchill tuition.

After a two-day hearing, the IHO issued a decision, on July 27, 2011, in which he ruled as follows:

1. Various minor procedural errors, individually and collectively, had impeded neither the student's right to a FAPE nor the parents' opportunity to participate in the decision-making process regarding their child's education. These procedural errors included: (i) inadequate description of the student's present level of academic (but not emotional) performance; (ii) no articulation of an annual goal that sufficiently addressed the student's difficulty with sensory processing; and (iii) goals were vague and did not provide a baseline from which to measure student progress or identify methods of measurement (resulting from inadequate parental involvement in their development).

2. The CSE conducted and/or relied on appropriate evaluations of the student's needs in preparing the IEP. The IHO specifically found that, "All required evaluations for an initial assessment of the student's needs were obtained, including a physical examination (Exhibit 9), Psychological Evaluation (Exhibit 8), Social History (Exhibit 5), Classroom Observation (Exhibit 19), and other appropriate evaluations or assessments (Exhibits 3, 4, 10, 12, 13, 14)." (IHO Decision at 17.) The IHO noted that information from those evaluations was not "comprehensively and appropriately put on the March 12, 2010 IEP, but ruled that this did not deprive the student of a FAPE because this concern was never raised until the parents filed their due process complaint notice in January 2011 – well after the time when a timely correction could have been made to the IEP.[1] The IHO did find that the description of the child's social/emotional needs in the IEP was adequate (IHO Decision at 18) – which, in view of the nature of the parents' objections to the SRO's decision, is of critical importance, since their objections center on such issues.

---

[1] Both the IHO and the SRO, but especially the IHO, made a point of noting that the parents' attorney, who has extensive experience with IDEA litigation, was present at the IEP Meeting but failed to make any objection to any perceived procedural failures in time for correction. The IHO appears to have perceived the failure to let easily correctable procedural errors pass without objection as a "gotcha" litigation tactic. Given the sophistication of counsel, I am inclinded to agree.

3. The hearing record lacked sufficient evidence demonstrating that the student could make meaningful progress or function appropriately in a general education environment (as opposed to the private school he was attending), because the student would be interacting with large groups of students in the hallways and during assemblies, lunch and recess. Significantly, the IHO did not find that a 12:1+1 specialized classroom setting was inappropriate for C.L. or that the additional services with which the District provided him were inadequate. Rather the IHO concluded that the District denied the child a FAPE by placing him in a community school rather than a private school. The IHO concluded that, "[T]he evaluations and reports, which the CSE relied on to describe [C.L.'s] functional levels and needs, uniformly recommended a more restrictive program." After summarizing the various recommendations he had reviewed – all of which recommended a small, structured language based program in a small classroom setting with a high teacher to student ratio – the IHO held, "I find that there was no report or evaluation before the CSE at the time of the March 12, 2010 meeting indicating [C.L.] would make meaningful progress in a less restrict[*sic*] setting in a regular public school *where he would be interacting with large groups of students in the hallways, assemblies, lunch and recess.*" (IHO Decision at 23) (emphasis added).

4. The District denied the child a FAPE because the parents had no opportunity to discuss the particular school or class to which their son was eventually assigned at or shortly after the March 2010 CSE meeting (because, of course, he was not assigned to a particular school until June).

5. Churchill, with its 12:1+1 class setting and more limited services than the District had proposed for the child, was an appropriate placement for the student.

6. Equitable considerations supported an award of tuition reimbursement.

In addition, while acknowledging that "it is not necessary for a decision in this case," the IHO concluded that the parents were entitled to the issuance of a Nickerson letter for 2010-11, on the ground that DOE failed to make a timely special education placement recommendation. Apparently there was a settlement of a class action, *Jose P.*, requiring the District to notify parents of special education placements by June 15 prior to the relevant school year. The IHO believed that the District had failed to comply with the terms of the *Jose P.* settlement by sending the FNR letter dated June 15 so that the parents got it on June 16 (although that did give the parents time to visit the proposed school, and such a visit occurred). This purported non-compliance with the stipulation of settlement, in the opinion of the IHO, entitled the parents to a Nickerson letter.

The District appealed.

7

## B. The SRO Decision

On October 31, 2011, the SRO sustained the appeal and reversed the order of tuition reimbursement for the parents.

First, the SRO concluded that the parents (and the District, for that matter) had waived their right to appeal from the IHO's findings that the March 2010 IEP failed to reference with specificity the student's present level of performance, that there was insufficient parental input into the development of goals, that the goals were vague and not measurable – but that these deficiencies did not deny the child a FAPE or deprive the parents of their statutory right of participation. The SRO so concluded because the parents (who had prevailed below) did not cross appeal from the IHO's conclusion that these found irregularities had not caused sufficient prejudice to rise to a remedial level (and that the City, which lost below, had not specifically identified these findings in its notice of appeal). The IHO's findings and ultimate conclusion were, therefore, not reviewed.

Second, she overruled the IHO's conclusion that there was no evaluation or report before the March 2010 CSE meeting indicating that the student would be able to make meaningful progress in a 12:1+1 specialized classroom setting in a community (as opposed to a private) school because he would be interacting with large groups of students outside of the classroom in which he was educated. The City argued that the IHO offered no support for his conclusion that the student could not make progress if he interacted with regular education students outside of his classroom setting. The SRO concluded that, at the time of the March 2010 CSE meeting, the district's recommendation that C.L. be placed in a 12:1+1 classroom at a community school, with additional related services (to which the parents offered no objection), was designed to mainstream the student to the maximum extent appropriate, thereby satisfying IDEA's mandate that the FAPE be provided in the least restrictive environment (LRE) possible.

Third, the SRO overruled the IHO's conclusion that the parents were entitled to a "placement meeting" at or shortly after the March 2010 CSE meeting, at which there would be discussion of the actual school assignment and the actual classroom assignment, as opposed to a discussion of the recommendation that C.L. be placed in a 12:1+1 classroom in a community school.

Fourth, the SRO overruled the IHO's decision in dictum that the parents were entitled to a Nickerson letter because they did not receive the final notice that included the assignment of their son to PS 198 until June 16, 2010.

Because the SRO concluded that the District had satisfied its obligation to offer C.L. a FAPE in the least restrictive environment, she did not reach the issues of (1) propriety of placement at Churchill or (2) equitable considerations supporting reimbursement of the parents for their unilateral placement of their son at Churchill.

The parents appeal. They assign all four of the SRO's conclusions as error.

## CONCLUSIONS OF LAW

### I. The March 2010 IEP offered C.L. a FAPE.

The question of whether the March 2010 IEP offered C.L. a FAPE for the 2010-11 school year is exactly the sort of decision that a court is to review deferentially, because the educational appropriateness of an IEP is a matter peculiarly within the expertise of state administrative authorities. *See M.H. v. New York City Dept. of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012), *citing Cerra*, 427 F.3d at 195. Giving appropriate deference to the SRO, whose decision I am reviewing, I find no flaw in it. Indeed, if I were reviewing it *de novo* and without any deference at all, I would find no flaw in it.

It cannot be disputed that the District offered the child a classroom setting that was precisely what the parents obtained at Churchill – a small classroom, consisting entirely of special education students, with a 12:1+1 student/teacher ratio, supplemented with additional services intended to benefit the child. The District's recommended services correlate exactly with the services provided to him at Churchill, except that the District provided more services and more 1:1 time to C.L. Most important, *all of the student's classroom educational activities were to be provided in this highly specialized environment; the IEP does not include one minute of mainstream classroom time.*

So the only substantive difference between the IEP and the parents' preferred placement is that Churchill is a small school attended only by disabled children, while PS 198 is a community school attended by a larger number of children, most of whom are general education students. C.L. was not to attend classes with those general education students under the IEP. His exposure to them was limited to, as the IHO put it, "hallways, assemblies, lunch, and recess."

The District argued, and the SRO found, that placing C.L. in a special education class in a community school gave him the benefit of the specialized education he needed in the least restrictive environment in which he could be expected to make meaningful educational progress, which is required by law. Upon review, I can find absolutely no flaw in that conclusion.

First, the IHO's contention that all the reports and evaluations recommended that C.L. be placed in a special education *school* is simply and verifiably wrong. The Court has personally reviewed the various reports and evaluations. All the reports and evaluations recommended that the boy be placed in a special education *classroom – which is precisely what the District offered.* Speech-language pathologist Nancy Trommer-Taul recommended that the child "continue to be enrolled in a small, structured, language-based, nurturing program with a high teacher to student ratio to facilitate cognitive/linguistic/social/emotional development." (DOE Ex. 4.) Special Education Teacher Michele Finkelman, C.L.'s teacher in his pre-school placement, recommended that he be placed in a "small structured classroom with bright non-aggressive

peers" and a high teacher/student ratio. (DOE Ex. 12.) Again, there is no mention of being in a special education *school,* only a special education *classroom.* Kimberly J. Fellingham, Occupational Therapist, recommended that the boy "be in a small classroom setting with non-aggressive peers." (DOE Ex. 13.) None of these recommendations mentions any need for the small, structured classroom to be in a special education school.[2] The only evaluation that explicitly recommends placement in a "special education school" is the recommendation of Clinical Psychologist Alison Meyer, who was retained privately by the parents. (DOE Ex. 8; SRO Decision at 2.)

Second, the SRO did not err in concluding that considerable evidence in the record supported the CSE's conclusion that placing C.L. in a school where he would interact only with other disabled children was not necessary. True, there is nothing in the record that specifically discusses whether the boy should take lunch breaks and recess with non-disabled children. However, there is considerable evidence that the child had sufficient social skills to benefit from interacting with such children, even if his intellectual functioning was better served by educating him in a special education classroom. For example, when observed in a classroom setting in February 2010 (one month before the IEP was formulated), C.L. did not mimic excitable peer behaviors or become distracted by them; he remained focused on his teacher and his lesson. (DOE Ex. 19.) C.L.'s play therapy/counseling services provider indicated that he made "clear gains" in peer interaction during his pre-kindergarten year, specifically in his ability to take turns. (DOE Ex. 7.) Even Meyer, the one person who explicitly recommended placement in a special education school, describes C.L. as "well-related once he becomes familiar and comfortable," and as showing interest in other children and engaging with them, having good attentional skills, academic skills ranging from high average to superior (early reading and math) to low (listening comprehension) and showing interest and making progress interacting with peers.

This information apparently indicated to the CSE, and to the SRO, that the child would benefit from a less restrictive environment than would be provided at a school attended only by disabled children – as long as contact with such students occurred outside the classroom setting. In that way, he could be given significant help with both his receptive and expressive language delays (specifically identified as having an effect on C.L.'s ability to interact with his peers) and with his socialization skills (as the SRO observed, the special education teacher of the recommended 12:1+1 class taught her students how to interact with non-disabled peers), without any distractions that might arise if non-disabled students were in the classroom – but would learn in a non-classroom setting to interact and get along with the non-disabled children he will inevitably encounter in the world. According to the SRO, intensive, specialized classroom instruction in a general school setting addressed C.L.'s academic and social needs in the least

---

[2]  I do not read Trommer-Thaul's recommendation that C.L. "continue to be enrolled in a small, structured, language-based nurturing program" to preclude placement in such a program in a public school.

restrictive environment in which he could be expected to make progress. This is precisely the sort of expert assessment to which a reviewing court must give deference in the IDEA context.

The parents insist that it was error for the SRO to credit the hearing testimony of the school psychologist, Anita Lee, who served as a member of the CSE team. Ms. Lee testified about how the educational program recommended by the IEP would have met J.L.'s educational needs, and the SRO relied heavily on her testimony. The parents argue that, while Ms. Lee meets the definition of IDEA's requirement of "an individual who can interpret the instructional implications of evaluation results" be present at the CSE meeting, her testimony was incredible because she (and the Committee) did not rely on, and were not familiar with, the report of the parents' privately retained psychologist, as required by IDEA.

In fact, the parents mischaracterize Ms. Lee's testimony. She did indeed testify that the Committee did not specifically discuss the Meyer report during the March meeting, but she never testified that the Committee was unfamiliar with the report. In fact, she testified that the CSE relied on the "psychological examination" in order to determine the child's learning styles, IQ, strengths and weaknesses, and how he was doing over all. (Tr. at 20:12-22:12.) As the only document fitting that description is the report of Clinical Psychologist Meyer, I cannot accept the parents' argument that Ms. Lee's testimony was not worthy of belief because she was not familiar with the psychologist's report.

There is no suggestion in the IHO's decision that the IHO found Ms. Lee's testimony to be incredible, as the parents suggest. Rather, as the District points out, the IHO made no credibility finding about Ms. Lee to which the SRO was obligated to defer. Rather, the IHO relied on the Meyer Report (and only on the Meyer Report) in deciding that C.L. needed to be placed in a special education *school*, while Ms. Lee and the CSE – after considering the Meyer Report and other evidence – concluded that, while the boy needed a special education *classroom*, that classroom did not need to be in so restrictive a school setting. As discussed above, the IHO erred in saying that there was no evidence in the record from which the CSE could have concluded that a placement less restrictive than special education school (as opposed to classroom) was appropriate for the boy. Since there was evidence in the record from which the CSE could have concluded that a special education school was *too* restrictive a placement, the SRO was perfectly free to credit the testimony of Ms. Lee, a trained educational psychologist who, after evaluating all of the evidence (not just the Meyer Report), decided in favor of a special education classroom (with the same student teacher ratio and more support services than Churchill offered) in a general education school.

I note that the IEP accepted nearly all of Psychologist Meyer's recommendations, including two 1:1 sessions of both speech-language therapy and occupational therapy each week. The one recommendation that Meyer (and only Meyer) made that the CSE did not accept was the recommendation for private school. The fact that Ms. Lee thought that the services offered by the

public education system were adequate to address the boy's needs does not make her an incredible witness.

In sum, I cannot conclude that the SRO erred in finding that the March 2010 IEP offered C.L. a FAPE in the least restrictive environment where he could be expected to make meaningful educational progress. It may not have offered the family everything loving parents wanted at taxpayer expense – it may even not have offered their son the best shot at maximizing his potential. But that is not the standard.

So if the SRO's decision is to be overturned, it must be on procedural grounds.

**II.  The SRO did not err in finding that the failure to hold a "placement meeting" to discuss the specific school building in which C.L. would be educated was not a procedural failure that denied the child a FAPE or the parents any rights.**

The SRO concluded, as a matter of law, that the IHO erred when he held that the parents were denied their right to meaningful participation in planning their son's education because there was no discussion of his assignment to PS 198 until the assignment was made in June 2010 – rather than at the March 2010 CSE meeting or thereafter at a "placement meeting." Because interpretation of law is not a matter within the special administrative competence of the SRO, she is not entitled to any particular deference on review. That said, there is absolutely nothing wrong with her conclusion.

The parents' argument rests on the proposition that their child's "educational placement" refers not only to the types and sizes of classes, individualized attention, and additional services that the District proposes to offer their son, but also includes the specific school to which he will be assigned, as well as information about the other students in the class (some of which is no doubt protected by student privacy laws). The parents are wrong. The Second Circuit has held that the phrase "educational placement" refers to the general educational program that a CSE develops – the classes, individualized attention, and additional services – and not the "bricks and mortar" of the particular school to which the child is ultimately assigned. *T.Y. v. New York City Department of Education*, 584 F. 3d 412, 419-20, *cert. denied*, 130 S. Ct. 3277 (2010). The requirement that an IEP include the "location" of recommended special education services does not mean that the IEP must identify a specific building site in a multi-school district to which the child will be assigned; rather, it means that the CSE must identify where the student will receive services (special education class or general education class; community school or private school). A school district can make a school placement for many reasons, including its own administrative convenience, as long as assignment to a school is made in conformity with the CSE's educational placement recommendation. There is no legal requirement that the particular school building be identified or discussed at an IEP meeting. In fact, IDEA itself does not require that the CSE be involved in selecting the school. *See Letter to Veasey*, 37 IDELR 10 (OSEP 2001). New York State happens to have chosen to assign this function to the CSE. *See* 8 NYCRR

200.4(d)(2)-(4). But that does not expand the parents' rights under IDEA, which extend only to meaningful participation in the child's "educational placement." The District fully complied with its obligation to the parents in that respect, and there was no procedural error in not holding a meeting to discuss the school building assignment.

The SRO also did not err in concluding that the parents' failure to raise the issue of a lack of a placement meeting either in their due process complaint notice or during the course of the impartial hearing waives the issue. (*See* discussion at SRO Decision at 15.)

Finally, I reject the parents' argument (*see* Memorandum of Law at page 16) that the lack of a placement meeting violated their child's FAPE rights because C.L.'s placement in a classroom at PS 198, with "an unknown and potentially disruptive or low-functioning grouping of students" (which could be read as nothing more than a thinly–veiled reference to "not the sort of child who goes to an expensive private school") was  inconsistent with the recommendations in the various reports in the child's record. There is not the slightest suggestion in the record that PS 198 was not a school "that cannot satisfy the IEP's requirements." *T. Y. v. New York City Dept. of Educ.*, 584 F. 3d 412, 420 (2d Cir. 2009). The recommendations suggested a classroom setting that is "calm and not too stimulating," "nurturing," and "with non-aggressive peers." Not a scintilla of evidence would support a conclusion that the other five year olds who would be assigned to the 12:1+1 kindergarten classroom in a non-selective public school like PS 198 were likely to be "aggressive." The parents appear to suggest that they had a right to know more details about the 11 other children who would have been in C.L.'s public school placement, so they could evaluate whether those children were sufficiently "calm" and "non-aggressive" to allow their son to receive a FAPE. But IDEA affords the parents no right to participate in the selection of a their child's classmates.

Furthermore, private school is no guarantee of non-disruptive peers. In fact, the record reflects that at least some of the children in C.L.'s pre-kindergarten at Churchill were disruptive – otherwise, C.L.'s  classroom observer would not have noted that the boy remained calm when other children in his class engaged in what she euphemistically described as "excitable behaviors." (DOE Ex. 19.)

### III. The IHO did not err in concluding that certain procedural irregularities, individually or taken together, did not deny the child a FAPE or the parents meaningful participation in the formulation of their son's educational placement.

Both the IHO and the SRO identified various procedural irregularities in the formulation of C.L.'s IEP, but concluded that neither individually nor collectively had these irregularities denied the boy a FAPE or the parents their right to meaningful participation. This conclusion, too, I affirm.

It is well settled that not every procedural irregularity in the formulation of a child's IEP will deny the child a FAPE or the parents their right to participate in formulating their child's

13

educational placement. *A.C. v. Bd. Of Educ.*, 553 F.3d 165, 172 (2d Cir. 2009); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003); *Perricelli v. Carmel Cent. Sch. Dist.*, No. 06 Civ. 2114 (MS)(LMS) 2007 WL 465211, *10 (S.D.N.Y. Feb. 9, 2007). It is, therefore, critically important to analyze what the impact of any irregularities is on the rights of parents and child.

The first thing to note is what the identified procedural irregularities did *not* involve. The child was fully and properly evaluated by all relevant teachers and specialists – including evaluators selected by the District and (in the case of Meyer) by the parents – prior to the preparation of an IEP. The District timely convened an IEP meeting. The CSE was properly constituted; the only omission from the statutorily mandated attendance list was the parent representative, and the record reveals that the parents waived in writing their right to have an additional parent member present at the meeting.[3] At the meeting, the CSE considered not only the placement that was ultimately adopted, but also the benefits of both more and less restrictive placements. As discussed above, there was support in the administrative record for the CSE's conclusion that the child's overall abilities and cognitive strengths counseled against placing him in a specialized school as well as a specialized classroom – even if that was not the conclusion preferred by the parents. The District timely prepared its FNR (it was dated June 15, 2010) and it was received by the parents the next day, which gave them time prior to the end of the school year to visit the designated school and observe the type of class to which their son would be assigned.

The SRO declined to review the IHO's determination that the March 2010 IEP (1) failed to specifically reference the student's present level of performance, (2) did not include sufficient parental input into the development of goals for the child, and (3) contained goals that were vague and not measurable. Neither did the SRO review the IHO's determination that these procedural irregularities neither impeded the student's right to a FAPE nor significantly impeded the parents' opportunity to participate in the decision-making process regarding their son's educational placement.

The parties have briefed extensively the propriety of the SRO's conclusion that the parents (who were, after all, the prevailing party at the IHO level) waived their right to contest these findings at the State review level by not specifically cross-appealing from them. Rather than engage in that debate, I am simply going to review the IHO's conclusion that procedural irregularities did not impede either the child's or the parents' rights. On review, I conclude that the IHO did not err when he found no prejudice to either child or parents resulting from any procedural violations.

---

[3] Which makes it hard to understand how the parents could possibly have assigned the composition of the CSE as error.

First, there can be no issue of insufficient parental participation in this particular case. The parents were aware of and involved in the child's pre-school and pre-kindergarten evaluations, obtained their own privately-retained clinical psychologist's report, attended the CSE meeting, and were represented by counsel at the CSE meeting and throughout the administrative process – *i.e.*, long before the impartial hearing. They were fully aware of their rights and, diligent parents that they are, they exercised those rights at every turn. There is no indication that the parents were unaware of their son's level of performance at the time of the formulation of the IEP; rather, all the evidence tends to demonstrate that they were familiar with the contents of all the evaluations and reports, which were made available to the parents and which, as the IHO correctly found, contained "a detailed description of his academic functioning."

Second, nothing in the record suggests that any insufficiency in the IEP in terms of the presence or absence of clear and measurable goals prejudiced the rights of either parents or child. In this Circuit, courts are "reluctant to find a denial of a FAPE based on failures in IEPs to indentify goals or methods of measuring progress." *P.K. v. N.Y. City Dept. of Education*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011); *R.R. v. Scarsdale Union Free School District*, 615 F. Supp. 2d 283, 295 (S.D.N.Y. 2009). The sufficiency of goals and strategies in an IEP is quintessentially the type of issue on which deference to the expertise of administrative officers is appropriate. *Grim*, 346 F. 3d at 382.

The record amply supports the IHO's reasoned conclusion that the goals on the March 2010 IEP – which targeted C.L.'s deficits in eight separate areas (abstract reasoning, social skills, tolerating and expressing feelings, visual motor skills, gross motor and fine motor skills, and receptive, expressive and pragmatic language skills) – "sufficiently address the student's needs as described in the reports and evaluations." (IHO Decision at 18.) While not every goal was accompanied by specifics about how progress would be measured, many were; for example, improvement in receptive language would involve the boy's following multi-step commands four times out of five trials and responding to "wh" questions with fading prompts. Ms. Lee testified that the classroom teacher would formulate appropriate methods of measurement for progress toward some goals at the beginning of the school year, six months after the IEP meeting (Tr. 35-36.) This seems a perfectly acceptable solution, especially when dealing with a very young child, for whom appropriate measurements might well change rapidly. *See W.T. v. Bd. Of Educ. of School District of New York City*, 716 F. Supp. 2d 270, 281-82 (S.D.N.Y. 2010).

Because the SRO correctly concluded that the IEP developed for the boy was not "defective," she was within her rights to reject the IHO's refusal to rely on testimony from Meredith Brosnan, a teacher at PS 198, who testified about how the IEP would have been implemented at the school and what she did in the classroom to help her students learn how to socialize properly and interact with regular education students outside the classroom. (SRO Decision at 13.) Contrary to the parents' argument, Ms. Brosnan's testimony was not designed to cure procedural defects in the IEP.

Neither did the IHO err in concluding that the IEP's goals were not deficient because they (1) failed to include a goal to address C.L.'s anxiety, or (2) failed to include a sensory integration issue goal. The IHO found no mention of anxiety issues in the Psychological Evaluation, Parent's Checklist, Social History or Classroom Observation notes, and so correctly concluded that there was no need for any such goal in the boy's IEP. (IHO Decision at 19.) And while the IHO believed the IEP should have included a goal concerning sensory integration, his conclusion that this omission in and of itself did not deny the child a FAPE is understandable in view of the large number of goals that were included in the IEP – all of which were keyed to the child's needs and deficits as identified in the plan. This differentiates the case from *M.S. v. Yonkers Bd. of Education*, 231 F. 3d 96, 103-04 (2d Cir. 2000), where the IEP did not adequately describe the student's deficits, and so could not possibly have specified goals directed toward improvement in those areas.

Insofar as any listed goals may have been insufficiently specific, there was obviously no prejudice to the child's rights, since the CSE's ultimate recommendation for his classroom placements and support services, as memorialized in the IEP, is substantively identical to, or even in excess of, what the parents deemed acceptable in the private school setting they preferred. And the parents' right of participation was not compromised by any lack of goal specificity, because the parents appear to have deliberately chosen not to assert their right to object to the sufficiency of such matters. Any deficiencies in the proposed IEP that related to the sufficiency or specificity of goals were known at the latest at the March 2010 CSE meeting; the parents (and their lawyer, who had already been retained and who was present at the meeting) could have raised those deficiencies and asked for clarification at that time. Instead, the parents and their attorney elected not to ask for further clarification, raising the issue for the first time in their due process complaint, which was filed in January 2011. By that time, as the IHO so presciently observed, it was too late to make any changes that would have addressed timely objections to the sufficiency of the IEP.[4]

In neither the parent's moving memorandum of law nor the District's response is there any discussion of the IHO's admittedly "unnecessary" finding that the parents were entitled to a Nickerson letter because the District did not send them the child's FNR in time for them to receive it by June 15, as allegedly required pursuant to a consent decree in a case called *Jose P. v. Ambach*, 553 IDELR 298, No. 79 Civ. 270 (E.D.N.Y. Jan. 5, 1981), *aff'd* 669 F. 2d 865 (2d Cir. 1982). I assume this means that the parties agree with the SRO's determination that this piece of dictum by the IHO exceeded his jurisdiction. (*See* SRO Decision at 16 and cases cited.) I will, therefore, deem the issue abandoned and not address it.

---

[4] The IHO expressed what the Court interprets as understandable distaste for "gotcha" litigation tactics. The child's best interest is served only when the parents, as part of their participation in the process, demand clarification of the anything on the IEP that does not clearly inform them about their child's progress and the metrics used to measure it. Failure to raise such objections in a timely manner is unfair to the district, which is burdened with the task of devising IEPs for, and educating, thousands of students with disabilities.

Because I have affirmed the SRO's decision that the IEP afforded the child a FAPE, there is no need for this Court to address either the adequacy of the parents' placement or the equitable considerations supporting reimbursement of private school tuition.

## CONCLUSION

The SRO's decision is affirmed; the plaintiffs' motion for summary judgment is denied and the defendant's is granted, and the complaint is dismissed.

The Clerk is directed to remove the motions at Docket Nos. 10 and 13 from the Court's list of open motions and to close the case.

Dated: February 20, 2013

U.S.D.J.

BY ECF TO ALL COUNSEL

17